**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | Case No. 24-10032-CJP |
| PAUL J. PHILLIPS, JR., | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

## MEMORANDUM OF DECISION AND ORDER

Before the Court is the *Debtor's Objection to Claim of Manuel Garcia* [ECF No. 46] (the

"Claim Objection") filed by Paul J. Phillips, Jr. (the "Debtor") objecting to the claim of creditor

Manuel Garcia and Garcia's *Motion for Relief from Automatic Stay* [ECF No. 36] (the "Relief

from Stay Motion," together with the Claim Objection, the "Contested Matters").  Garcia filed a

proof of claim ("Claim No. 3-1") asserting rights to "the entire legal title to and equitable interest

in the property" at 89-91 Whitman Street, Unit 2, East Bridgewater, Massachusetts 02333 (the

"Property") based on a purchase and sale agreement executed prepetition by Garcia and Debtor

on January 15, 2022 (the "Sale Agreement").  The Debtor seeks to have this Court determine that

the Sale Agreement terminated prepetition necessitating the disallowance of Garcia's claim.

Garcia seeks relief from stay to pursue specific performance of the Sale Agreement and other

alleged agreements and the Debtor opposes such relief [ECF No. 45] (the "Debtor's

Opposition").

At the heart of this dispute is whether  the Sale Agreement terminated prepetition and, if

it did not, what are its terms.  If the Court were to determine that the Sale Agreement did not

terminate prepetition, the Debtor has stated his intention to reject the Sale Agreement pursuant to

11 U.S.C. § 365.[1]  Garcia seeks a determination that the Sale Agreement was an executory contract as of the petition date and intends to assert rights as a counterparty to the Sale Agreement in possession of the Property pursuant to § 365(i).  Garcia requests that this Court order the Debtor to sell him the Property under the terms of the Sale Agreement, subject to certain offsets.

The record includes trial affidavits filed by Garcia [ECF No. 150] (the "Garcia Affidavit"), the attorney retained by the lender to represent Garcia in the sale transaction, David Cuttler [ECF No. 150] (the "Cuttler Affidavit"), and the attorney representing the Debtor in the sale transaction, Praven Shenoy [ECF No. 153] (the "Shenoy Affidavit"), all or portions of which were admitted as direct testimony.[2]  An evidentiary hearing was held on the Contested Matters (the "Hearing"), at which Garcia, Cuttler, and Shenoy testified and were cross-examined. The parties filed briefs after the Hearing to clarify certain issues raised by the Court.[3]

Upon consideration of the Contested Matters, testimony at the Hearing, briefing by the parties, the record of the case, and the findings made in this Order, the Court hereby OVERRULES IN PART and SUSTAINS IN PART the Claim Objection and DENIES the Relief from Stay Motion because the relief sought directly conflicts with rights and remedies provided by the Bankruptcy Code in respect of the Sale Agreement.  Further, the Court grants the

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ *101 et seq.*, as amended (the "Bankruptcy Code" or "Code").

[2] The Debtor did not testify at the Hearing, and his affidavit [ECF No. 152] was not admitted into evidence.

[3] *Post-Hearing Memorandum* [ECF No. 170] (the "Garcia Brief"); *Debtor's Post Trial Brief* [ECF No. 171] (the "Debtor Brief").

2

construed request by the Debtor to reject the Sale Agreement, subject to Garcia's rights under § 365(i) as set out below.[4]

## I.   Positions of the Parties

### a. Whether the Sale Agreement was Terminated Prepetition

The Debtor contends that the Sale Agreement was terminated prepetition by (1) Garcia's inability to obtain financing, (2) the Debtor's inability to deliver marketable title, and/or (3) the failure to close by the deadline purportedly last formally extended to February of 2023. The parties agree the closing date was extended at least through February of 2023,[5] but characterize their dealings after February of 2023 differently. The Debtor describes this period as a "re-negotiation of the purchase price" due to title and other issues with closing, and, therefore, the parties could not have intended to extend the closing deadline beyond February 2023. Debtor Br., at 2. The Debtor suggests any negotiations after expiration of the February 2023 deadline

---

[4] Post-hearing, the Debtor filed a third amended chapter 13 plan ("Plan") [ECF No. 162] that is premised on a sale of the Property and rejects the Sale Agreement to the extent it was not terminated prepetition. Plan, at 5 ("All pre petition Purchase & Sale Agreements executed prior to the filing date of this case are deemed rejected, and more specifically the P&S between the Debtor and Manuel Garcia re: 91 Whitman Street, East Bridgewater, MA, which the Debtor contends was terminated pre petition, is deemed rejected."). If the Sale Agreement is executory and were to be rejected by the Debtor, Garcia would have rights under § 365(i) to compel performance of the Sale Agreement as a purchaser in possession, so the Court must determine the terms of the Sale Agreement that would apply with respect to the purchase price if it determines that the Sale Agreement was executory as of the petition date.

The Court construes Garcia's proof of claim and other filings and arguments made within the context of the Contested Matters as an assertion of his rights to order the Debtor to sell the Property to Garcia pursuant to § 365(i) subject to offset. Debtor has indicated through his filings and arguments made at the Hearing that he intends to reject the Sale Agreement. *See* Debtor's Opp., at 2 ("Assuming, arguendo, that the prepetition Agreement is found to be executory in nature, it is the Debtor's intent to reject it."); Plan, at 5 (asserting all prepetition purchase and sale agreements are "deemed rejected" and Part 6 of the Plan does not include any executory agreements being assumed). "[T]he trustee may assume or reject an executory contract or unexpired lease of residential real property . . . at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." 11 U.S.C. § 365(d)(2). For the purposes of enforcing Garcia's rights under § 365(i), the Court construes the Debtor's position in this case and his repudiation of the Sale Agreement prepetition as a request to reject the Sales Agreement.

[5] Emails between Garcia and the Debtor's attorneys indicate the closing date was extended through and including February 3, 2023. Ex. 4, at MG0105.

3

were attempts to execute another agreement that was never executed and, therefore, never bound the parties.

Garcia argues the closing deadline was extended through and including June 5, 2023, by written and oral communication between Garcia's counsel, Attorney Cuttler, and Debtor's counsel, Attorney Shenoy, that their continued dealings waived the "time is of the essence" provision of the Sale Agreement, and the Debtor failed to give Garcia notice establishing a new closing date. Garcia Br., at 6–8. Therefore, even after the sale negotiations ended in June 2023, Garcia states the contract never terminated, and, as of the petition date, it constituted an executory contract such that the Debtor must deliver title under § 365(i)(2)(B).

     *b.  The Oral Agreements, the Integration Clause, and the Statute of Frauds*

In multiple filings and in testimony at the Hearing, Garcia stated that he and the Debtor entered into certain oral agreements to apply rent payments towards the purchase price of the Property. Pursuant to what Garcia characterized as the first oral agreement (the "Rent to Own Agreement") of the parties, Garcia testified the parties agreed to apply all rent payments made until closing to the purchase price. Garcia Aff., at ¶ 8. Since October 2019, Garcia's rent payments have been $2,750.00 per month. *Id.* at ¶¶ 8, 10. The $44,000.00 combined credit in an unsigned purchase and sale agreement (the "Unsigned P&S") reflected the "sixteen (16) separate Rent to Own Payment received by the Debtor" by March 2021. *Id.* at ¶ 25. Garcia alleged a second oral agreement (the "Second Oral Agreement," together with the Rent to Own Agreement, the "Oral Agreements") amended the Rent to Own Agreement, whereby the parties agreed to a "closing cost" of $494,000.00, of which a $44,000.00 credit would be applied to the closing cost, in addition to "any future Rent to Own Payments until the actual closing date." *Id.*

at ¶ 27.  The Debtor denied having entered into the Oral Agreements in his pleadings and at the

Hearing through counsel, but did not testify.

Garcia testified he made the $2,750.00 monthly payments from October 2019 until March

2022, except for a few months, "totaling at least $74,250.00."  *Id.* at ¶¶ 10, 67.  He stopped

paying rent around March 2022 "per the instruction of Debtor through his legal counsel" and

recommenced payments under a stipulation (the "Stipulation") [ECF No. 88] in July 2024,

entered into by the parties in connection with the resolution of a motion to compel access to the

Property filed by the Debtor and which payments would be credited toward the purchase price,

as use and occupancy, or as directed by further order of the Court depending on the

determination of the Contested Matters.  *Id.* at ¶¶ 67–68; *see also* Ex. 4, at MG0015–16.

The purchase price provided in the Sale Agreement is $475,000.00, comprised of

$25,000.00 "to be paid as a gift of Equity" and $450,000.00 to be paid at closing.  The Sale

Agreement makes no reference to the Oral Agreements.  It includes an integration clause stating

"[t]his Agreement supersedes and replaces all obligations made in any prior Contract To

Purchase or agreement for sale entered into by the parties."  Neither party substantially addressed

the implications of the integration clause in their post-Hearing briefing.[6]  The Debtor asserts that,

even had he made the Oral Agreements, because they were not memorialized in writing, the

Statute of Frauds bar their enforcement as they related to the sale of real property.  Garcia argues

the terms of the Oral Agreements are binding under a theory of promissory estoppel that

---

[6] The integration clause is referred to in the Debtor's brief, Debtor Br., at 1, and in his attorney's affidavit, Shenoy Aff., at ¶ 2.5.  Garcia objected to the Debtor's reference to the integration clause in his affidavit for "attempt[ing] to offer expert opinion testimony as to the contractual effect of a contractual provision."  *Objs. to Direct Examination Affs. of Paul J. Phillips, Jr.* [ECF No. 151].  The Hearing included some testimony by Attorneys Cuttler and Shenoy on the integration clause.

provides an exception to the Statute of Frauds.  Garcia Br., at 4–6.  According to Garcia, the

record establishes that:

> (1) Debtor made a representation, via the . . . Rent to Own Agreement, which was
> intended to induce Garcia to make the monthly Rent to Own Payments – where
> Garcia understood that said Rent to Own Payments would ultimately be credited
> towards his purchase of [the Property]; (2) Garcia's making the Rent to Own
> Payments directly resulted from Debtor's representation – i.e., the Rent to Own
> Agreement; and (3) Garcia made the Rent to Own Payments to his detriment,
> having made such payments in reliance on Debtor's representation that Garcia
> would ultimately have said payments credited towards the sale price of [the
> Property] even though [the Property], at times, was in disrepair.

Garcia Br., at 5.  He further asks this Court to:

> enter an Order: (i) permitting the Trustee to sell 91 Whitman to Garcia for
> $352,750.00 under the terms thereof, with closing date for said sale set for at least
> ninety (90) calendar days from the date of this Court's Order approving such a
> sale; and (ii) that the payments due by Garcia to Debtor per [the Stipulation] shall
> cease immediately upon issuance of an Order of the Court authorizing the sale of
> 91 Whitman to Garcia.

Garcia Br., at 9.  Including the Stipulation payments made by the date of this Order, the Court

estimates Garcia's asserted purchase price to be approximately $338,500.00.[7]


## II.  General Findings of Fact and Procedural History[8]

The Property is one condominium unit at a property located at 89-91 Whitman Street,

---

[7] Garcia's asserted purchase price is derived from the following calculation: $450,000.00 purchase price less ($11,000.00) paid per Stipulation from July through October 2024, ($77,000.00) in rent to own payments made prior to June 5, 2023, ($2,750.00) for prepayment of last month's rent to own payment, and ($2,000.00) one month's security deposit.  The breakdown provided by Garcia would result in a purchase price of $352,250.00.  By the date of this Order, Garcia presumably would have made additional payments under the Stipulation of $13,750, totaling $24,750.00 for payments from July 2024 through March 2025.

[8] Findings of fact are incorporated throughout the discussion in this decision.  Any findings of fact that are, in whole or part, rulings of law shall be considered as such and vice versa.  While I may cite to specific supporting evidence in the record, my findings are often supported by additional evidence in the record I have considered, and I do not intend to limit support for my findings to the cited portion of the record.  Further, to the extent that I reference testimony or other evidence that supports my rulings, I have credited that testimony or other evidence even if I have not made an express finding.  Where I have referenced testimony or other evidence that does not support my rulings, I have weighed that evidence, but it has not overcome the weight that I have given to other evidence in the record, whether explicitly referenced or not.

East Bridgewater, Massachusetts 02333 ("89-91 Whitman"), comprised of two units and shared

common areas.  As of January 13, 2023, 89-91 Whitman became part of a condominium property

known as the 89-91 Whitman Street Condominium Trust (the "Trust") pursuant to a Master Deed

recorded on January 13, 2023 at the Plymouth County District Registry of Deeds in Book 57596,

Page 60 and shown in a Condominium Site Plan recorded at the Registry in Book 66, Page 903

and governed by the provisions of the Declaration of Trust.  The Debtor is the sole Trustee of the

Trust, which holds title to the Property and the other unit at 89-91 Whitman.

In October 2019, Garcia began renting the Property.  Garcia testified that, on or about

September 27, 2019, the parties orally agreed that Garcia's rent payments would be applied to

his eventual purchase of the Property and the Debtor presented the Unsigned P&S to Garcia on

or around March 14, 2021, but it was not executed by the parties.  Ex. 2; Garcia Aff., at ¶ 24;

Claim No. 3-1, at 72–85.  The Unsigned P&S includes a purchase price of $494,000.00,

comprised of $44,000.00 as a credit for Garcia's rent payments[9] and $450,000.00 in financing.

According to Garcia, at some point after the Unsigned P&S was presented, but before executing

the Sale Agreement, the Debtor and Garcia entered the Second Oral Agreement.  Garcia Aff., at

¶ 27.  The Debtor denied having entered into the Oral Agreements in pleadings and at the

Hearing through counsel, but the Debtor chose not to testify at the Hearing and his affidavit was

not admitted into evidence.  Because the Debtor submitted no evidence or testimony to

contradict Garcia's allegations about the existence of the Oral Agreements, the Court finds the

Oral Agreements were entered into by the Debtor and Garcia prior to execution of the Sale

Agreement.

---

[9] The credit includes $1,000.00 "earnest money payable after the Effective Date of this Agreement" and $43,000.00 "at closing, the cash portion of Purchase Price payable by the Buyer".  Ex. 2.

On January 15, 2022, the Debtor and Garcia entered into the Sale Agreement with a buyer's financing deadline of February 25, 2022 and a closing date of March 15, 2022.  Ex. 3.  Garcia stated that both parties were represented by legal counsel in the review, negotiation, and drafting of the Sale Agreement, Garcia Aff., at ¶ 43, but later testified at the Hearing that either the Debtor or Attorney Shenoy drafted it.  In the affidavit submitted by the Debtor's attorney and in testimony at the Hearing, Attorney Shenoy stated the Sale Agreement was not prepared by attorneys or realtors.  Shenoy Aff., at ¶ 2.2.  At the Hearing, Garcia's attorney testified he received the Sale Agreement after it had been executed and was not involved in its drafting but amended it after execution to clarify the payment terms.

The Sale Agreement provides for a purchase price of $475,000.00, comprised of $25,000.00 "to be paid as a gift of Equity" and $450,000.00 to be paid at closing.  The Sale Agreement includes provisions addressing time for performance ("of-the-essence"),[10] extensions of the time for performance,[11] and requirements for termination.[12]  It also includes an integration

---

[10] Sale Agreement at ¶ 5 ("TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS AGREEMENT").

[11] Sale Agreement, at ¶ 10 ("If the SELLER cannot convey title as required by this Agreement cannot deliver possession of the Premises as agreed, or if at the time of the delivery of the deed the Premises do not conform with the requirements set forth in this Agreement or the BUYER is unable to obtain title insurance in accordance with paragraph 7, upon written notice given no later than the time for performance from either party to the other, the time for performance shall be automatically extended for thirty (30) days, except that if BUYER'S mortgage commitment expires or the terms will materially and adversely change in fewer than thirty (30) days, the time for performance set forth in paragraph 5 shall be extended to one business day before expiration of the mortgage commitment SELLER shall use reasonable efforts to make title conform or to deliver possession as agreed, or to make the Premises conform to the requirements of this Agreement Excluding discharge of mortgages and liens, about which the SELLER has actual knowledge at the time of signing this Agreement, the SELLER shall not be required to incur costs or expenses totaling in excess of one-half (½) of one percent of the purchase price to make the title or the Premises conform or to deliver possession as agreed.").

[12] *Id.* at ¶ 10 ("If at the expiration of the time for performance or if there has been an extension, at the expiration of the time for performance as extended, the SELLER, despite reasonable efforts, cannot make the title or Premises conform, as agreed, or cannot deliver possession, as agreed, or if during the period of this Agreement or any extension thereof, the SELLER has been unable to use proceeds from an insurance claim, if any, to make the Premises conform, then, at the BUYER'S election, any payments made by the BUYER pursuant to this Agreement shall be immediately returned. Upon return of all such funds, all obligations of the BUYER and SELLER shall terminate and this Agreement shall automatically become void and neither the BUYER nor SELLER shall have further recourse or remedy against the other."); *id.* at ¶ 16 ("If . . . the BUYER has been unable to obtain such

8

clause.[13]  The Sale Agreement appears to be a standard form residential purchase and sale

agreement from the Massachusetts Association of Realtors.  The Sale Agreement did not require

Garcia to pay a deposit at the time of execution.

After delays, a variety of issues with the Property, and extended closing deadlines

through and including June of 2023, discussed *infra*, the parties never closed the sale transaction.

While the parties continued working towards consummating the sale, it appears undisputed that

the Debtor attempted to repudiate the Sale Agreement on or shortly after June 5, 2023.  Garcia

Br., at 8; Ex. 4, at MG0001–4.[14]  On or about December 8, 2023, the Debtor initiated a summary

process action against Garcia in the Massachusetts Housing Court.  Relief from Stay Mtn.;

Zheng Aff., at ¶ 3.[15]  Garcia filed an action in the Plymouth Land Court for specific performance,

promissory estoppel, and breach of implied covenant of good faith and fair dealing against the

Debtor and the Trust.

The Debtor filed the chapter 13 petition on January 9, 2024.  At all relevant times, Garcia

has remained in possession of the Property.  Since July of 2024, in accordance with the

Stipulation entered between the parties, Garcia has paid the Debtor $2,750.00 per month pending

---

written commitment [for mortgage financing in the amount of $450,000], the BUYER may terminate this
Agreement by giving written notice that is received by the SELLER . . . ."); *id.* at ¶ 17 ("If the results [of the
inspections] are not satisfactory to BUYER, in BUYER'S sole discretion, BUYER shall have the right to give
written notice received by the SELLER . . . terminating this Agreement.").

[13] *Id.* at 1 ("This Agreement supersedes and replaces all obligations made in any prior Contract To Purchase or
agreement for sale entered into by the parties.").

[14] In other filings, however, Garcia alleged the parties, through respective counsel, continued to negotiate through
and including early December 2023, when the Debtor initiated the housing court summary process action.  Relief
from Stay Mtn.  In a text dated November 16, 2023, the Debtor stated he did not have an attorney "at th[e] time."
Ex. 1, at 339.

[15] An affidavit of Garcia's successor attorney, Yue Zheng, is attached to the Relief from Stay Motion.  [ECF No. 36-
2] (the "Zheng Affidavit").  While not admitted in evidence, the allegation that the eviction action was commenced
was not disputed.

this Court's resolution of the parties' dispute.  Text messages exchanged between the Debtor and

Garcia pre- and post-petition reflect a tenuous landlord/tenant and seller/purchaser relationship.

Ex. 1.

### III.   <u>The Sale Agreement was not Terminated Prepetition</u>

The Debtor asserts three arguments as to why the Sale Agreement terminated prepetition.

The first two are unsupported by the express terms of the Sale Agreement.  First, even assuming

Garcia could not have obtained financing, Garcia possessed the exclusive right to terminate the

Sale Agreement if he was unable to obtain financing.[16]  Nothing in the record establishes that

Garcia terminated the Sale Agreement.  Second, Garcia had the right to accept the Property and

title as could have been delivered by the Debtor in its "then current condition."[17]  To this point,

according to the Debtor, his inability to deliver marketable title caused the Debtor and Garcia to

renegotiate the purchase price, and "if [the purchase price] is part of exercising a contingency or

if the parties fail to reach a new agreement on essential terms," then such renegotiation "leads to

termination of the original agreement."  Debtor's Br., at 5.  Although the parties discussed a

potential reduction in price, Ex. 4, at MG0164–65, such a negotiation, by itself, does not

terminate the Sale Agreement.[18]

---

[16] *See* Sale Agreement, at ¶ 16 ("If, despite [] diligent efforts, the BUYER has been unable to obtain such written commitment [for mortgage financing in the amount of $450,000.00], the BUYER may terminate this Agreement . . . .").

[17] *See id.* at ¶ 12 ("The BUYER shall have the right to accept such title to the Premises as the SELLER can deliver at the time for performance and if extended, shall have such right at the time for performance, as extended.  The BUYER shall also have the right to accept the Premises in the then current condition and to pay the purchase price without reduction of price.").

[18] Debtor seems to argue that—after the Sale Agreement purportedly terminated in February of 2023—the parties entered negotiations to execute a subsequent sale agreement.  The Debtor cites to caselaw discussing the impact of a failure to execute  on whether a contract is binding.  *See Schwanbeck v. Fed.-Mogul Corp.*, 412 Mass. 703, 706 (1992) (parties negotiated and intended to enter into purchase and sale agreement but failed to execute); *Levenson v. L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 130 (1991) (same); *see also Villa v. Holmgren*, 83 Mass. App. Ct. 1114 (2013) (denying specific performance action of "amended" purchase and sale agreement that was never executed

The third reason advanced by the Debtor—failure to complete the sale by the stated

closing deadline as had been extended by further agreement—similarly does not establish

termination.  In a contract with a "time is of the essence" provision, determining whether a

contractual deadline was waived is a question of fact or, if facts are stipulated, a question of law.

*McCarthy v. Tobin*, 429 Mass. 84, 88 n.5 (1999).  Such deadlines will be strictly enforced unless

they are waived by the actions of the parties.  *See Owen v. Kessler*, 56 Mass. App. Ct. 466, 466–

67 (2002) (citing *McCarthy*, 429 Mass. at 88–99).  "Waiver of a time-is-of-the-essence clause

'requires unequivocal actions on the part of the waiving party.'"  *McCarthy v. Young as Trs. of*

*Nantucket Sound Tr.*, No. 22 MISC 000093 (MDV), 2023 WL 3884958, at *4 (Mass. Land Ct.

June 8, 2023) (quoting *Perroncello v. Donahue*, 64 Mass. App. Ct. 564, 568 (2005), *rev'd on*

*other grounds*, 448 Mass. 199 (2007)).  Waiver may be established where parties continue to

negotiate after the expiration of a deadline.  *See, e.g.*, *McCarthy*, 429 Mass. at 88–89 (parties

waived deadline to execute agreement where seller delivered draft agreement to buyer after

deadline expired and parties continued to negotiate terms thereafter); *Ferguson v. Maxim*, 96

Mass. App. Ct. 385, 392 (2019) ("defendants very well may have waived that condition

[precedent] by continuing to negotiate the purchase and sale past the deadline listed in the offer

to execute that document").  Discussing the possibility of an extension prior to expiration of the

contractual deadline by itself, however, is not likely to be sufficient to establish waiver of the

deadline.  *See Owen*, 56 Mass. App. Ct. at 469–71 (finding insufficient evidence of "waiver of

the 'time is of the essence' clause" with respect to deadline to execute purchase and sale

---

and differed in many terms from the executed offer to purchase).  These cases are distinguishable.  Here, it is
undisputed the Debtor and Garcia executed the Sale Agreement, the terms of which Garcia is attempting to enforce.

agreement where parties discussed possible extension to conduct inspection which became unnecessary before expiration of the deadline).

The Massachusetts Land Court's decision in *Dossantos v. Myers* is instructive. No. 21 MISC 000547 (KTS), 2023 WL 8108822 (Mass. Land Ct. Nov. 22, 2023). In *Dossantos*, the purchase and sale agreement contained a time is of the essence provision and closing date of July 6, 2018. *Id.* at *1. After execution of the agreement and prior to closing, the parties discovered the seller—who inherited the property to be sold—required authority from the probate court in order to convey the property. *Id.* The parties agreed to extend the closing until July 30, 2018, and continued to deal after that date once it became clear the seller needed more time to complete the probate action. *Id.* In 2019, the buyer moved into the property as a tenant. *Id.* Upon consideration of the buyer's action for specific performance filed in November 2021, the Land Court found the seller "waived the 'time is of the essence' clause" and "agreed to a general extension for closing until" completion of the probate action. *Id.* at *1, *5. The Land Court based its finding on (1) the parties' continued communication in which neither party indicated that the closing deadline passed and the fact that the deposit was not returned to or demanded by the buyer, (2) the parties' agreement for the buyer to move into the property as a renter in March 2019, and (3) emails between counsel that "confirmed the understanding of the parties that the Agreement remained in full force and effect and that a closing would be scheduled once the Probate Action was concluded." *Id.* at *4–5.

Here, the actions of the parties after February of 2023 not only extended the closing deadline, but also waived the time is of the essence provision until a reasonable time to perform had been re-established. After the initial February 2023 deadline passed, counsel for both parties

exchanged emails in an effort to complete the transaction. Ex. 4, at MG0150–176.[19]

Additionally, in an email dated March 8, 2023, an office representing a lender in the transaction

stated "no projected closing date as of yet," and, in his response a few days later, the Debtor's

attorney did not deny this contention. *Id.* at MG0115–19.

Notably missing from the emails in the record is any reference to the February 2023

closing deadline having passed. Garcia testified he was prepared to perform under the terms of

the Sale Agreement, despite renegotiations of the purchase price and the Debtor's failure to

address certain issues with the Property after February of 2023. Upon the threat of foreclosure

and after requests by Garcia to reduce the purchase price due to various issues with the Property,

in emails dated June 5, 2023, counsel for the Debtor indicated the Debtor's desire to terminate

the transaction.[20] Even after this purported repudiation, the parties continued to communicate. In

an email dated July 12, 2023, Garcia's counsel stated the Debtor "would be getting back to him

on some potential options," *id.* at MG0177, and in a text message dated October 16, 2023, Garcia

directed the Debtor to communicate with Garcia's successor counsel Zheng, Ex. 1, at 335.

Garcia's attorney's affidavit states that, from June of 2023 to January of 2024, the Debtor failed

to set or request an exact time for closing. Cuttler Aff., at ¶ 14. No formal written notice of

termination was ever delivered by the Debtor to Garcia.[21] These continued communications are

persuasive evidence that the "time is of the essence" provision was waived. *See Dossantos*, 2023

---

[19] *See also* Ex. 4, at MG0151–52 (in an email dated May 8, 2023, Debtor's attorney stated the Debtor is "not reducing the price"); *id.* at MG0150–51 (in an email dated May 20, 2023, Garcia's attorney stated Garcia "would still move forward and agree to handle all repairs and even replace the septic after closing at his cost (upon Lender approval), but if he does there need to be a price reduction so he can handle this after close").
[20] *Id.* at MG0003 ("The seller is not willing to reduce the price further. . . . So unfortunately I believe there's no possibility of being able to close on this property."); *Id.* at MG0002 ("[I]t looks like he's going to keep the property from going into foreclosure.").

[21] *See* Sale Agreement, at ¶ 21 (requiring written notices when required or permitted under the agreement).

WL 8108822, at *5.  The Debtor did not testify at the Hearing to refute these allegations and

failed to submit evidence to the contrary.

The Sale Agreement was an executory contract as of the petition date subject to the

establishment of a new deadline for closing and a formal termination of the contract.

Accordingly, because Garcia remains in possession of the Property and the Sale Agreement was

an executory contract at the time of petition that the Debtor has stated a clear intent to reject, the

Court will approve the Debtor's rejection, and Debtor "shall deliver title to [Garcia] in according

with the provisions of [the Sale Agreement], but is relieved of all other obligations to perform

under [the Sale Agreement]."  *See* 11 U.S.C. § 365(i)(2)(B).

The Court must next address whether the Oral Agreements made between the parties are

enforceable and reduce the purchase price of the Property from that stated in the Sale Agreement.

## IV.    **The Oral Agreements, the Integration Clause, and the Parol Evidence Rule**

Although the Debtor did not offer evidence undermining the existence of the Oral

Agreements, because Garcia seeks to enforce the Oral Agreements to modify the purchase price,

the Court must consider the applicability of the integration clause and the parol evidence rule

with respect to the Oral Agreements.

### a.   *Whether the Integration Clause Bars Consideration of the Oral Agreements*

"Generally, contracting parties are understood to have included an integration clause in

their written agreement with the intent 'to preclude the subsequent introduction of evidence of

preliminary negotiations or side agreements.'"  *Realty Fin. Holdings, LLC v. KS Shiraz

Manager, LLC*, 86 Mass. App. Ct. 242, 247–48 (2014) (quoting *Chambers v. Gold Medal

Bakery, Inc.*, 83 Mass. App. Ct. 234, 244 (2013)).  Massachusetts courts have stated the presence

of an integration clause is evidence of integration but is not dispositive.  *Chambers*, 83 Mass.

14

App. Ct. at 243.  In certain instances, a court may consider the parties' negotiations to determine whether they intended the agreement to be fully integrated.  *See Wang Lab'ys, Inc. v. Docktor Pet Ctrs., Inc.*, 12 Mass. App. Ct. 213, 219 (1981).  It is "an issue of fact for the decision of the trial judge, entirely preliminary to any application of the parol evidence rule." *Id.*  Where both parties are sophisticated businesspeople represented by counsel who "have negotiated and executed a complex written document touching on all significant aspects of their transaction," the court need not consider the negotiations to "divine the intention of the parties on the question of integration." *Realty Fin. Holdings, LLC*, 86 Mass. App. Ct. at 248 (quoting *USTrust v. Henley & Warren Mgmt., Inc.*, 40 Mass. App. Ct. 337, 341 (1996)); *see also Bendetson v. Coolidg*e, 7 Mass. App. Ct. 798, 802–03 (1979).  In cases involving boilerplate agreements or less sophisticated parties, however, prior negotiations may be considered to determine whether the parties intended to fully integrate the agreement.  *See Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 535–36 (1st Cir. 2022) (citing *Realty Fin. Holdings, LLC*, 86 Mass. App. Ct. at 249); *Wang Lab'ys, Inc.*, 12 Mass. App. Ct. at 218 (finding "standardized printed form" with integration clause as not fully integrated).

Here, the Sale Agreement includes a generic broad integration clause stating "[t]his Agreement supersedes and replaces all obligations made in any prior Contract To Purchase or agreement for sale entered into by the parties."  The Sale Agreement was memorialized on a Massachusetts Association of Realtors residential purchase and sale standardized form.  The fill-in-the-blank form includes other boilerplate provisions inapplicable to this transaction, including a deposit and broker's fees, and the parties filled in handwritten terms throughout the form, leaving certain provisions blank or writing in "N/A."  *See* Sale Agreement, at ¶¶ 5, 14, 22, 23.  Although Garcia stated in his affidavit that the parties were represented by counsel in the

15

negotiation and drafting of the Sale Agreement, he later testified that either the Debtor or

Attorney Shenoy drafted it.  Moreover, the Sale Agreement, emails between the parties'

attorneys following its execution, and testimony by both attorneys suggest the Sale Agreement

was drafted without the assistance of counsel, apart from the "gift of equity" language that was

typed into the agreement by Attorney Cuttler after execution.  Considering the standard form

used to draft the Sale Agreement and the level of sophistication of the parties, notwithstanding

some involvement of counsel with the parties leading up to and after its execution, the

integration clause may not bar the Court from considering prior negotiations between the parties,

including the asserted Oral Agreements.

    *b.  Whether the Prior Oral Agreements Modify Terms of the Written Sale Agreement*

    The Court must next determine whether the Sale Agreement may still be partially

integrated with respect to the purchase price and whether the parol evidence rule precludes the

Court from considering evidence of the Oral Agreements to modify express terms of the Sale

Agreement executed after the parties made the Oral Agreements.

    "[E]ven where an agreement is not completely integrated—and therefore a 'complete and

exclusive statement of the terms of the agreement,' Restatement (Second) of Contracts § 210(1)

(1981)—it may still be partially integrated, thereby 'constituting a final expression of one or

more terms of an agreement,' *id.* § 209(1)."  *WLC Com. Prop. Servs., Inc. v. Wal-Mart Stores,*

*Inc.*, No. CV 17-12270-FDS, 2018 WL 1083735, at *3 (D. Mass. Feb. 27, 2018).  "A partially

integrated agreement 'discharges prior agreements to the extent that it is inconsistent with

them.'"  *Id.* (quoting Restatement (Second) of Contracts § 213(1)).  "[P]arties are bound by the

plain terms of their contract . . . and contemplation of the parties is not material where the

agreement is unambiguous."  *Fairfield 274-278 Clarendon Tr. v. Dwek*, 970 F.2d 990, 994 (1st

16

Cir. 1992) (internal quotations and citations omitted). In accordance with the parol evidence rule, "[e]vidence of prior or contemporaneous oral agreements cannot be admitted to *vary* or *modify* the terms of an unambiguous written contract." *Id.* at 993; *see also Aerostatic Eng'g Corp. v. Szczawinski*, 1 Mass. App. Ct. 141, 143 (1973) (finding prior oral agreement could not modify contract where "[i]t is clear to [the court], from reading the document, that this represented the complete agreement between the parties with respect to the terms of payment"); !  *see also Zotbelle, Inc. v. Kryolan Corp.*, 416 F. Supp. 3d 33, 46 (D. Mass. 2019).

The Court finds the Sale Agreement was partially integrated with respect to the purchase price. *See WLC Com. Prop. Servs., Inc.*, 2018 WL 1083735, at *3 (finding snow removal contract "at least partially integrated as to" payment terms where subsequent written contract lacked "any gaps or reference to any prior agreement" and its terms "directly contradict the terms of the claimed oral agreement"). Because the Sale Agreement was unambiguous with respect to the purchase price, the parties are bound to those terms. *See Fairfield 274-278 Clarendon Tr.*, 970 F.2d at 993. Accordingly, the Court may not consider the terms of the Oral Agreements to modify the purchase price in the Sale Agreement.

Even if the Court were to consider evidence of the parties' negotiations and prior agreements, the Court would not find that the Oral Agreements survived execution of the Sale Agreement. On this record, while the parties may have made the Oral Agreements, Garcia did not meet his burden to show that there was a further agreement with the Debtor that any Oral Agreements would remain in effect that directly contradicted the written terms of the Sale Agreement. The terms of the Unsigned P&S regarding purchase price were carried into the Sale Agreement, albeit renamed and with a "reduction," in which the net purchase price did not change. The purchase price was reduced by $19,000.00 from the Unsigned P&S ($494,000.00)

17

to the Sale Agreement ($475,000.00), which mirrors the reduction from the combined "credit" to

Garcia of $44,000 in the Unsigned P&S to the "gift of Equity" of $25,000 in the Sale Agreement.

At the Hearing, witnesses provided testimony with respect to the gift of equity provision.

Garcia testified that the Debtor told him when signing the Sale Agreement that the $25,000.00

gift of equity was an attempt to reflect the purchase price in the Unsigned P&S, but Garcia stated

that he had an understanding that the Oral Agreements would still affect the purchase price.

Attorney Cuttler testified he was not involved in the drafting of the Sale Agreement, but clarified

that he assisted with the gift of equity provision (and presumably the amended "Total") "for

lender purposes, that had to be typed in."  In the Sale Agreement at the time of signing, the

"Purchase Price" and "Total" were written-in as "475,000" and "450,000," respectively, but the

best inference from the evidence is that Attorney Cuttler amended the Sale Agreement after

signing to include "$25,000.00" "as a gift of Equity" and correcting the "Total" to

"$475,000.00."  Garcia further testified that he didn't understand the $494,000.00 to $475,000.00

purchase price difference but signed the Sale Agreement because he "just wanted to close the

deal at 450."  After the Sale Agreement was executed, Garcia testified he applied for financing in

the amount of $450,000.00.

Emails from Garcia's counsel to the Debtor's counsel shortly after Garcia signed the Sale

Agreement suggest Garcia believed more rent payments would be credited towards the purchase

price and that the Sale Agreement should be "corrected."[22]  The Debtor's counsel asked what

---

[22] In a January 18, 2022 email to the Debtor's counsel, Garcia's counsel stated "I see that this one finally came together . . . . [T]he price breakdown needed to be corrected on the standard form our clients signed, the seller is crediting 25K as a down payment towards the rent to Buyer has paid." Ex. 4, at MG0012.  In another email dated January 24, 2022, Garcia's counsel appeared to attach a list of repairs needed and other comments compiled by Garcia, including "Homeowner is not applying all of my rent for down payment. Why? In the [Unsigned P&S] he applied $43K but in the one we both signed it only says $25K. I paid over $50K alone in rent since October 2019 including security deposit." *Id.* at MG0009–10.

type of credit Garcia was looking for, followed by another email stating the Debtor "already

agreed to a lower price, in a very hot sellers' market, and on top of it agreed to [make] a $25,000

reduction on the purchase price."[23]  Garcia's attorney replied that that he'd let Garcia "know

there will be no further price reduction but" that he felt Garcia "is entitled to a rent break for

months of non-use areas," referring to issues with the Property's basement and garage.[24]  The

Debtor's attorney replied, in relevant part, "[y]our client seems to think that all the rent he's paid

to my client since October 2019 should be credited towards the purchase. This is not an

installment sale situation."[25]  After more exchanges, the Debtor agreed to waive rent pending

closing.  The Debtor's attorney stated that "[a]t the time of the closing, my client will apply the

last month[']s rent to March 2022. He will apply the security Deposit to April 2022. And

whatever portion of May/June 2022 is needed beyond that will be waived," to which Garcia's

attorney said he would talk to Garcia about it "but sounds reasonable to me."[26]  A few months

later, the Debtor's attorney confirmed the Debtor's continued intention to close considering the

fact that the Debtor "agreed to the waiving of rent until closing under the terms we agreed to in a

prior email."[27]  By as late as March 23, 2023, Garcia's attorney emailed the Debtor's attorney

requesting certain changes to the Sale Agreement, including renaming the gift of equity term to

"rent to own reimbursement" without any request to increase the $25,000.00 amount.  Ex. 4, at

MG0137.  The emails around this period and leading up to the Debtor's purported repudiation

---

[23] See emails dated March 28, 2022 at 10:02 a.m. and 2:20 p.m.  *Id.* at MG 0025–27.

[24] See email dated March 28, 2022 at 2:31 p.m.  *Id.* at MG0023–24.

[25] See email dated March 28, 2022 at 3:30 p.m.  *Id.* at MG0019.

[26] See emails dated March 30, 2022 at 10:10 a.m. and 11:31 a.m.  *Id.* at MG0014–16.

[27] See email dated June 15, 2022 at 1:30 p.m.  *Id.* at MG0045–46.

include further requests by Garcia's attorney to reduce the purchase price, but these requests

stemmed from issues with the Property that Garcia offered to resolve at his own cost after

closing; they were not an attempt to clarify the Sale Agreement to incorporate a credit for rent

payments as alleged by Garcia pursuant to the Oral Agreements.

Even if the Sale Agreement was not at least partially integrated with respect to the

purchase price and the parol evidence rule did not apply, upon consideration of the record,

notwithstanding what Garcia may have believed or wished, the evidence does not support a

finding that the Debtor agreed that any Oral Agreements regarding purchase price were to

survive execution of the Sale Agreement.  Because of these rulings, I am not required to reach

the issue of whether the Statute of Frauds would have precluded giving effect to the Oral

Agreements.

## V.    Application of § 365(i)(2)(B)

With regard to Garcia's rights pursuant to § 365(i), the statute provides for the following:

(1) If the trustee rejects an executory contract of the debtor for the sale of real
property . . ., under which the purchaser is in possession, such purchaser may
treat such contract as terminated, or, in the alternative, may remain in
possession of such real property . . ..

(2) If such purchaser remains in possession—

(A) such purchaser shall continue to make all payments due under such
contract, but may, offset against such payments any damages occurring
after the date of the rejection of such contract caused by the
nonperformance of any obligation of the debtor after such date, but such
purchaser does not have any rights against the estate on account of any
damages arising after such date from such rejection, other than such
offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the
provisions of such contract, but is relieved of all other obligations to
perform under such contract.

11 U.S.C. § 365(i).

20

The Debtor shall deliver title "in accordance with the provisions of such contract," but he is relieved from "all other obligations to perform under such contract." 11 U.S.C. § 365(i)(2)(B). Pursuant to the statute, should Garcia elect to close pursuant to the Sale Agreement, the Debtor shall deliver title to the Property to Garcia "as is," notwithstanding a any nonconformity with certain conditions of the Sale Agreement.[28]  Even with these issues, at the Hearing Garcia's counsel expressed Garcia's desire to exercise rights under § 365(i)(2)(B) and proceed with the sale.

Garcia argues his "Post-P&S Breach Payments"—i.e., payments since the Debtor's repudiation in June 2023—should be credited towards the purchase price pursuant to the statute. Garcia Br., at 8–9.  The statute provides Garcia for the opportunity for offset.  *See* 11 U.S.C. § 365(i)(2)(A).  The Court need not rule on whether Garcia's payments to the Debtor since July 2023 would constitute "payments due under" the Sale Agreement.  Because the terms of the Stipulation expressly provide that Garcia's monthly payments of $2,750.00 under the Stipulation "shall be credited toward the purchase price of the Property in the event Garcia is ultimately awarded the relief sought in the [Relief from Stay Motion], [Garcia's claim], **and/or** Garcia's [land court action] or as may be otherwise directed by the Court."  Stipulation, at 2 (emphasis added).  Had the Court determined the Sale Agreement been terminated prepetition and Garcia not obtained any form of relief, the Stipulation payments would be credited towards use and occupancy of the Property.[29]  Because the Court has found Garcia possesses a right to enforce

---

[28] As evidenced in the text messages and emails between the parties and their attorneys, the Court is aware of certain closing issues, including the failure to transfer a back lot to be included in common areas or the Property, a dispute involving solar panels, fixture issues, septic issues, and difficulties with obtaining title insurance or release of the liens covering both units at 89-91 Whitman.

[29] Stipulation, at 2 ("In the event the Garcia claim to the entire legal and equitable interest in the Property is denied, the [Stipulation] Payments shall be credited towards use and occupation for the Property. Nothing in this paragraph shall limit, waive, or otherwise effect[sic] Garcia's ability to recoup monies paid by Garcia to Debtor in connection

delivery of title pursuant to § 365(i), the Stipulation payments will be credited towards the purchase price of the Property.  As Garcia should have paid a total of $24,750.00 under the Stipulation to-date, the purchase price under the Sale Agreement will be reduced by any amounts Garcia has paid under the Stipulation as of the closing date (the "Reduced Purchase Price").

The Court directs Garcia to file a statement about his intent to enforce his rights under § 365(i) **on or before April 14, 2025.**  If Garcia intends to enforce his rights, the time for performance under the Sale Agreement shall be **June 30, 2025, at noon** or such other date and time as the parties may agree in writing or as may be ordered by the Court.  At closing, Garcia shall pay the Debtor the Reduced Purchase Price, and the Debtor shall deliver title of the Property to Garcia.  The Sale Agreement is deemed rejected as of the date of this Order, subject only to the potential election by Garcia under § 365(i).

### VI.   Conclusion

For the reasons above, the Claim Objection is denied in part as it may relate to Garcia's rights under § 365(i) and sustained in part as premature in the event Garcia elects not to close and wishes to assert rejection damages.  The Relief from Stay Motion is denied because the relief sought directly conflicts with rights and remedies provided by the Bankruptcy Code in respect of the Sale Agreement as an executory contract.  Further, as Garcia may enforce his rights pursuant to § 365(i) to compel the Debtor to convey title of the Property, the Relief from Stay Motion is denied as stated above.  Because the record shows that there are a number of potential issues with the Property, such as liens, Title V issues, title issues for common areas, and more, the Court understands that Garcia may have difficulty financing or satisfying himself on some of

---

with the Property prior to the execution of this Stipulation, including filing an amended proof of claim in this action for the sums paid by Garcia to Debtor in connection with the Property.").

these issues.  If he elects to assert his rights under § 365(i), he may exercise any right he may

have under the terms of the Sale Agreement to terminate the Sale Agreement up to seven (7)

days before the closing date.


Dated:  March 31, 2025                         By the Court,


                                               _____
                                               Christopher J. Panos
                                               United States Bankruptcy Judge